UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

v.

D-1  FCA US LLC,

Defendant.

Case No.    21-20031
HONORABLE  PAUL D. BORMAN

Violation: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371 & 29 U.S.C. §§ 186(a)(2) & (d)(1))

Statutory Maximum Period of Probation: 18 U.S.C. § 3561(c) (five years)

Statutory Minimum Period of Probation: 18 U.S.C. § 3561(c) (one year)

Statutory Maximum Fine: 18 U.S.C. § 3571(d) ($500,000 or the greater of twice the gross gain or twice the gross loss)

Statutory Minimum Fine: None/Not Applicable

# Rule 11 Plea Agreement

The United States of America, by and through the United States Attorney's Office for the Eastern District of Michigan, and the Defendant, FCA US LLC (the "Defendant" or "FCA"), by and through its undersigned attorneys, and through its

authorized representative, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

## I.     Guilty Plea

### A.     Count of Conviction

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of Michigan, and agrees to plead guilty to a criminal Information charging the Defendant with one count of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, that is, to violate the Labor Management Relations Act, 29 U.S.C. § 186(a)(2), (b)(1), and (d)(1).

### B.     Elements of Offense

The elements of conspiracy to violate the Labor Management Relations Act, as charged in Count One of the Information, are as follows:

(1)    two or more persons conspired to violate the Labor Management Relations Act in violation of 29 U.S.C. § 186(a)(2), (b)(1), and (d)(1);

(2)    the defendant knowingly and voluntarily joined the conspiracy; and

(3)    a member of the conspiracy did one of the overt acts described in the Information for the purpose of advancing or helping the conspiracy.

### C.   Factual Basis for Guilty Plea

Defendant is pleading guilty because it is guilty of the charge contained in the Information.  Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment B are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and Attachment B, and that the Information and Attachment B accurately reflect Defendant's criminal conduct and provide a factual basis for the guilty plea.

## II.   Sentencing Guidelines

### A.   Standard of Proof

The Court will determine all sentencing factors by a preponderance of the evidence.

### B.   Agreed Guideline Range

There are no sentencing guideline disputes.  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph Three. The United States and Defendant agree that a faithful application of the United States

Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.    The 2016 U.S.S.G. are applicable to this matter.

b.    <u>Offense Level</u>.  Based upon U.S.S.G. § 2E5.1, the total offense level is 28, calculated as follows:

| | | |
|---|---|---|
| (a)(1) | Base Offense Level | 10 |
| (b)(2) | Value of Payments >$3.5 million | +18 |
| **TOTAL** | | **28** |

c.    <u>Base Fine</u>.  Based upon U.S.S.G. § 8C2.4(a)(1)&(d), the base fine is $10 million

d.    <u>Culpability Score</u>.  Based upon U.S.S.G. § 8C2.5, the culpability score is 9, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | the organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in the offense | +5 |
| (g)(2) | The organization clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 1 |
| **TOTAL** | | **9** |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $10 million |

| | |
|---|---|
| Multipliers | 1.8 (min)/3.6 (max) |
| Fine Range | $18 million (min)/ $36 million (max) |

## III.    Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and Defendant agree that the appropriate disposition of this case is as set forth below and agree to recommend jointly that the Court, at a hearing to be scheduled at an agreed-upon time, impose it. The United States and Defendant waive the preparation of a Presentence Investigation Report. Defendant understands that the decision whether to proceed with the sentencing proceeding without a Presentence Investigation Report is exclusively that of the Court. In the event the Court directs the preparation of a Presentence Investigation Report, the United States will fully inform the preparer of the Presentence Investigation Report and the Court of the facts and law related to the Defendant's case.

### A.    Fine

In consideration of 18 U.S.C. § 3571(d) and all of the factors set forth in U.S.S.G. § 8C2.8 and 18 U.S.C. §§ 3553(a) and 3572(a), and pursuant to Federal Rule of Criminal Procedure ("Rule") 11(c)(l)(C), the parties agree that Defendant shall pay, directly or through its affiliates or subsidiaries, to the United States a

criminal fine of $30 million, payable in full within thirty days of entry of the plea and acceptance of this Agreement by the Court in this case. Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any external source with regard to the penalty, restitution, disgorgement, or any other amounts that Defendant pays pursuant to this Agreement. Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of this $30 million fine.

**B.      Probation**

The parties agree that a term of organizational probation for a period of three years should be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). The parties further agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs Six and Seven below as well as the payment set forth above.

**C.      Special Assessment**

Defendant will pay a special assessment of $400 within seven days of entry of the plea and acceptance of this Agreement by the Court.

**D.      Restitution**

The parties agree that there is no restitution in this matter.

## IV. Use of Withdrawn Guilty Plea

If the Court allows Defendant to withdraw its guilty plea for a "fair and just reason" pursuant to Fed. R. Crim. P. 11(d)(2)(B), Defendant waives its rights under Fed. R. Evid. 410, and the United States may use any statements that it makes in the course of its guilty plea or in connection with the Information or this Agreement, including the Statement of Facts set forth as Attachment B to the Agreement, against it in any proceeding for any purpose.

## V. Other Charges

In exchange for the guilty plea of Defendant and the complete fulfillment of all of its obligations under this Agreement, the United States agrees that it will not file additional criminal charges against Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures based on any of the conduct described in the Information or Attachment B.

This Paragraph does not provide any protection against prosecution for any crimes committed in the future by Defendant or by any of its officers, directors, employees, agents or consultants, whether or not disclosed by Defendant pursuant to the terms of this Agreement. This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of Defendant or its direct or indirect affiliates,

subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the Information, Attachment B, or in any other matters.

## VI.    Defendant's Obligations

Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the plea is entered and this Agreement is accepted by the Court and ending three years from the later of the date on which the plea is entered and this Agreement is accepted by the Court or the date on which the Monitor is retained by the Defendant, as described in Paragraph Eight below (the "Term"). Defendant agrees, however, that, in the event the United States determines, in its sole discretion, that Defendant has failed specifically to perform or to fulfill completely each of Defendant's obligations under this Agreement, an extension or extensions of the Term may be imposed by the United States, in its sole discretion, for up to a total additional time period of one year, without prejudice to the United States' right to proceed as provided in Paragraph Ten below. Any extension of the Term extends all terms of this Agreement, including the terms of the monitorship in Attachment C, for an equivalent period. Conversely, in the event the United States finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment C, and that the other provisions of this Agreement have been satisfied, the Term may

be terminated early, except for the Defendant's cooperation obligations described in Paragraph Seven below.

## VII. The Defendant's Cooperation and Reporting Obligations

A.     The Defendant shall cooperate fully with the United States in any and all matters relating to the conduct described in this Agreement and Attachment B and related conduct under investigation by the United States during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the United States, the Defendant shall also cooperate fully with other domestic law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and Attachment B. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the United States timely notice of its intent to rely upon this provision along with a log of any information or cooperation that is withheld based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such an assertion. The Defendant

agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

1.      The Defendant shall truthfully disclose all factual information with respect to its activities, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the United States may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the United States, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant.

2.      Upon request of the United States, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the United States the information and materials described in this Paragraph on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

3.      The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the United States, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in

federal trials, as well as interviews with domestic law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

4.    With respect to any information, testimony, documents, records or other tangible evidence provided to the United States pursuant to this Agreement, the Defendant consents to any and all disclosures to other governmental authorities in the United States of such materials as the Offices, in their sole discretion, shall deem appropriate.

B.    In addition to the obligations in this Paragraph during the Term, should the Defendant learn of any evidence or allegation of a violation of the Labor Management Relations Act, the Defendant shall promptly report such evidence or allegation to the United States. Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the United States that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the Eastern District of Michigan.

## VIII. Independent Compliance Monitor

Defendant agrees to retain an independent compliance monitor in accordance with Attachment C of this Agreement. Any failure to comply with this obligation shall constitute a breach of this Agreement and be subject to the terms set forth in Paragraph Ten.

A.      The Monitor's duties and authority, and the obligations of the Defendant with respect to the Monitor and the United States, are set forth in Attachment C, which is incorporated by reference into this Agreement. Within thirty calendar days after the execution of this Agreement, and after consultation with the United States, the Defendant will propose to the United States a pool of three qualified candidates to serve as the Monitor. If the United States determines, in its sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the United States, in its sole discretion, is not satisfied with the candidates proposed, the United States reserves the right to seek additional nominations from the Defendant. The parties will endeavor to complete the monitor selection process within sixty days of the execution of this agreement.

B.      The United States retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by the Defendant, though the Defendant may express its preference(s) among the candidates. In the event the

United States rejects all proposed Monitors, the Defendant shall propose an additional three candidates within twenty business days after receiving notice of the rejection. This process shall continue until a Monitor acceptable to both parties is chosen. The United States and the Defendant will use their best efforts to complete the selection process within sixty calendar days of the execution of this Agreement. The Defendant agrees to retain the Monitor for the term specified in this Paragraph promptly after the Monitor is selected. If, during the term of the monitorship, the Monitor becomes unable to perform his or her obligations as set out herein and in Attachment C, or if the United States in its sole discretion determines that the Monitor cannot fulfill such obligations to the satisfaction of the United States, the United States shall notify the Defendant of the release of the Monitor, and the Defendant shall within thirty calendar days of such notice recommend a pool of three qualified Monitor candidates from which the United States will choose a replacement. The Monitor will be required to provide monthly invoices of its fees and expenses, accompanied by a reasonably detailed description of time expended.

C.       The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph Six. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term,

are set forth in Attachment C. The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

## IX.   Appeal Waiver

Defendant waives any right it might have to appeal the conviction and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on any grounds. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a.

Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment B or

14

the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The United States is free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

## X.    Breach of Agreement

A.    If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to retain an independent compliance monitor or otherwise fails to comply with its obligations as set forth in Attachment C; or (d) otherwise fails to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the United States becomes aware of such

a breach after the Term of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the United States has knowledge, including, but not limited to, federal criminal violations relating to the conduct set forth in the Information and Attachment B, which may be pursued by the United States in the United States District Court for the Eastern District of Michigan or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the United States' sole discretion. Any such prosecution may be premised on information provided by the Defendant. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the United States prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with

respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph Six of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the United States are made aware of the violation or the duration of the term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

B.      In the event the United States determines that the Defendant has breached this Agreement, the United States agrees to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the United States in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the United States shall consider in determining whether to pursue prosecution of the Defendant.

C.      In the event that the United States determines that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the United States or to the Court, including the attached Statement of Facts, and

17

any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the United States against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the United States.

D. The Defendant acknowledges that the United States has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## XI.   Parties to Plea Agreement

A.    Unless otherwise indicated, this Agreement does not bind any governmental authority except the United States Attorney's Office for the Eastern District of Michigan.  Nevertheless, the United States will bring this Agreement and the nature and quality of the conduct and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

B.    The Defendant agrees that this Agreement will be executed by an authorized corporate representative.  The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors, in the form attached to this Agreement as Attachment A, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.  The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

## XII.  Change of Corporate Form

Except as may otherwise be agreed by the parties in connection with a

particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, it sells, merges, or transfers all or substantially all of its respective business operations or the business operations of its subsidiaries or affiliates involved in the conduct described in Attachment B of the Agreement attached hereto as they exist as of the date of the Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser to retain the commitment of the Defendant or any successor in interest thereto, to comply with the obligations described in this Agreement such that the obligations of this Agreement continue to apply to such business operations of the Defendant involved in the conduct described in Attachment B of the Agreement following the completion of the transaction. Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, if, during the Term of the Agreement, the Defendant undertakes any change in corporate form that involves business operations that are material to their consolidated operations or to the operations of any subsidiaries or any affiliates involved in the conduct described in Attachment B of the Agreement attached hereto, whether such transaction is structured as a sale, asset sale, merger, transfer, or other change in corporate form, the Defendant shall provide notice to the United States at least thirty days prior to

undertaking any such change in corporate form. If such transaction (or series of transactions) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the United States, it shall be deemed a breach of this Agreement.

## XIII. Failure of Court to Accept Agreement

This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

## XIV. Public Statements by the Defendant

A.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the

facts described in the Information and Attachment B. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraph Ten of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment B will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the United States. If the United States determines that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Attachment B, the United States shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment B provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment B. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

B.      The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the United States to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the United States and the Defendant; and (b) whether the United States has any objection to the release or statement.

## XV.   Complete Agreement

This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR FCA US LLC:**

Date: 1/26/2021

By:

Christopher Pardi
General Counsel
FCA US LLC

Date: 1/26/2021

By:

Nicolas Bourtin
Aisling O'Shea
Sullivan & Cromwell LLP
Counsel for FCA US LLC

Date: 1/26/2021

By:

Thomas Cranmer
Miller Canfield, P.L.C.
Counsel for FCA US LLC

24

**FOR THE UNITED STATES:**

MATTHEW SCHNEIDER
United States Attorney
Eastern District of Michigan

Date: 1-27-2021

By:

David A. Gardey
Chief, Public Corruption Unit

**JOHN NEAL** Digitally signed by JOHN NEAL
Date: 2021.01.27 16:00:54 -05'00'

John K. Neal
Chief, White Collar Crime Unit

Erin S. Shaw
Assistant United States Attorney

**ATTACHMENT A**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

At a duly held meeting on January 25, 2021, the Board of Directors (the "Board") of FCA US LLC (the "Company") resolved as follows:

**WHEREAS**, the Company, through its external legal counsel, has been engaged in discussions with the United States Attorney's Office for the Eastern District of Michigan in connection with its investigation into potential criminal violations related to the misuse of funds involving the UAW-Chrysler National Training Center (the "Investigation");

**WHEREAS**, the Board has been advised by its external legal counsel of the terms of the Information and Rule 11 Plea Agreement, with Attachments, as circulated to the Board (collectively, the "Plea Agreement"), including but not limited to, the payment of a criminal fine; and

**WHEREAS**, the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States Attorney's Office for the Eastern District of Michigan with respect to criminal violations identified during the Investigation and that no additional promises or representations have been made to the Company by any representatives of the United States Attorney's Office for the Eastern District of Michigan in connection with the disposition of the Investigation, other than those set forth in the Plea Agreement.

**THEREFORE**, this Board hereby **RESOLVES** that:

1. The Board authorizes the Company to: (a) consent to the filing of a one-count Information in the United States District Court for the Eastern District of Michigan charging the Company with conspiring with others, in violation of Title 18, United States Code, Section 371, to violate the Labor Management Relations Act, Title 29, United States Code, Sections 186(a)(2) & (d)(1); (b) waive indictment on such charge; (c) waive its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (d) consent to conducting all proceedings, including a plea hearing, via video or telephonic conference as provided for by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") and hereby waives any right to be present for such proceedings under the Sixth Amendment to the United States Constitution and Federal Rules of Criminal Procedure 11 and 43; and (e) agree to pay a criminal fine of $30,000,000 to the United States Treasury.

2. The Board acknowledges that it is in the best interests of the Company to enter the guilty plea provided for, and agree to the terms provided in, the Plea Agreement with the United States Attorney's Office for the Eastern District of Michigan in substantially the form and substance set forth in the form of the Plea Agreement presented to this Board;

3. The Board authorizes the Company to enter into and perform the Company's obligations under the Plea Agreement;

4. The Board authorizes, empowers and directs the Company's Chief Executive Officer and General Counsel (each an "Authorized Officer"), and the Company's external legal counsel, Sullivan & Cromwell LLP and Miller Canfield, P.L.C. (together "External Counsel"), to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board, with such changes as any Authorized Officer may approve;

5. The Board authorizes, empowers and directs the Authorized Officers and External Counsel to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolution (including execution and delivery of any such agreement or document on behalf of the Company);

6. The Board hereby authorizes and empowers the Authorized Officers and External Counsel to act and speak on behalf of the Company in any proceeding or as otherwise necessary for the purpose of executing the Plea Agreement, including entry of a guilty plea in court on behalf of the Company;

7. All of the actions of any Authorized Officer or External Counsel, which would have been within the scope of and authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as authorized actions of the Company; and

8. The Authorized Officers and External Counsel are individually authorized, empowered or directed to provide to the United States Attorney's Office for the Eastern District of Michigan a certified copy of these resolutions.

I hereby certify that the above is a true and accurate copy of the resolutions of the Board of the Company passed on January 25, 2021.

Date: _____January 25, 2021_____          By:

Christopher Pardi
Secretary
FCA US LLC

## **ATTACHMENT B**

## **STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Plea Agreement, dated January 27, 2021 between the United States Attorney's Office for the Eastern District of Michigan and FCA US LLC (FCA). The parties hereby agree and stipulate that the following information is true and accurate.

FCA admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Had this matter proceeded to trial, FCA acknowledges that the United States would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information:

1.     Defendant FCA, sometimes referred to as FCA US LLC, was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. At all relevant times, FCA was the United States operating subsidiary of Fiat Chrysler Automobiles NV, a publicly traded organization listed on the New York Stock Exchange. FCA manufactured and sold automobiles in the United States under brands such as Chrysler, Jeep, Dodge, and Ram. FCA was an employer in an industry affecting interstate commerce and subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

2.     The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization based in Detroit, Michigan. The UAW represented tens of thousands of non-managerial employees employed by FCA at numerous locations in Michigan and across the United States.

3.     Established in 1985 pursuant to a collective bargaining agreement between Chrysler Corporation (Chrysler) and the UAW, the UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation based in Detroit, Michigan. The NTC was established to function as a labor management committee under the Labor Management Labor Relations Act, 29 U.S.C. § 186(c)(9). The stated purpose of the NTC was to provide for the education, training, and retraining of workers. Pursuant to the 1985 collective bargaining agreement, Chrysler was obligated to fund the NTC based on a formula set out in the agreement. That obligation, as extended through subsequent collective bargaining agreements, was assumed by FCA in connection with its acquisition of substantially all of the assets of Chrysler LLC in 2009 pursuant to Section 363 of the U.S. Bankruptcy Code.

4.     The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President

2

of the Chrysler Department of the UAW served as the Chairs of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior UAW officials from the UAW and FCA executives and employees.

5.      Alphons Iacobelli was the FCA Vice President for Employee Relations and a person acting in the interest of employer FCA from 2008 through his separation from FCA in June 2015. As the FCA Vice President for Employee Relations, Iacobelli was the senior FCA official responsible for administering the collective bargaining agreements between FCA and the UAW, and FCA's lead representative for labor relations and management of FCA's relationship with the UAW. Iacobelli was also the senior FCA official responsible for resolving disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW. Iacobelli was the Co-Chair of the NTC and the NTC Joint Activities Board from 2008 through his separation from FCA in June 2015.

6.      Jerome Durden was a Financial Analyst in FCA's Corporate Accounting Department and a person acting in the interest of employer FCA from 2008 through his separation from FCA in June 2015, during which time Durden was the Controller of the NTC and served as the secretary of the NTC Joint Activities Board.

7.     Michael Brown was employed as a Director for Employee Relations at FCA from 2009 through May 2016. During that time, Brown was personally involved in the administration of the national collective bargaining agreements between FCA and the UAW and had authority to sign letters and agreements on behalf of FCA with the UAW. Brown also represented FCA as a Co-Director of the NTC.

8.     General Holiefield was a UAW officer who served as the Vice President for the Chrysler Department of the UAW from 2006 through mid-2014. As the most senior UAW official in the Chrysler Department, Holiefield was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. From 2012 through 2013, Holiefield made over $200,000 worth of personal purchases on his NTC credit card, paid for with money supplied by FCA to the NTC pursuant to the collective bargaining agreements, including jewelry, furniture, designer clothing, and other personal items and expenses. Holiefield is deceased.

9.     Norwood Jewell was a UAW officer who served as the Vice President for the Chrysler Department of the UAW from mid-2014 through 2016. As the most senior UAW official in the Chrysler Department, Jewell was responsible for

negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. Between 2014 and 2016, Jewell accepted over $90,000 in prohibited payments in the form of personal purchases on NTC credit cards, including entertainment, liquor, extravagant meals, and golf.

10.     Nancy A. Johnson was a UAW employee who served as an official in the UAW Chrysler Department from 2014 through August 2016. Between 2014 and 2016, Johnson accepted over $75,000 in prohibited payments in the form of personal purchases on NTC credit cards, including golf clubs, clothing, jewelry, luggage, designer shoes, dining, and other personal items and expenses.

11.     Keith Mickens was a UAW employee who served as an official in the UAW Chrysler Department from 2010 through December 2015. Between 2012 and 2014, Mickens accepted over $141,000 in prohibited payments in the form of personal purchases on NTC credit cards, including electronics, concert and sporting event tickets, and other personal items and expenses.

12.     Virdell King was a UAW employee who served as an official in the UAW Chrysler Department from 2008 until February 2016. Between 2011 and 2016, King accepted over $40,000 in prohibited payments in the form of personal

5

purchases on NTC credit cards, including clothing, designer shoes, jewelry, luggage and other personal items and expenses.

13.   Monica Morgan was a professional photographer and Holiefield's girlfriend and, later, wife. They wed in 2012.

14.   FCA provided the funding for the NTC, pursuant to its obligations under the collective bargaining agreements between the UAW and Chrysler and, later, FCA. From 2009 to 2015, FCA made annual transfers to the NTC of between approximately $13 million and approximately $31 million per year. During that time, FCA executives and employees and UAW officials on the Joint Activities Board controlled the finances and spending of the NTC. This included FCA employees Iacobelli and Durden. Following the separation of Iacobelli and Durden in June 2015, other FCA executives and employees assumed this responsibility.

15.   Between in or before January 2009 and continuing through in or after 2016, Iacobelli and Durden knowingly and voluntarily agreed to use, or authorized the use of, NTC bank accounts and credit cards to pay for more than $3.5 million of personal purchases, personal expenditures, and personal travel for General Holiefield, Monica Morgan, Norwood Jewell, Nancy A. Johnson, Keith Mickens, Virdell King, and other UAW officials, and their associates and family members. As part of his guilty plea, Iacobelli acknowledged that he had used the bank accounts

6

and credit card accounts of the NTC to benefit officers and employees of the UAW, knowing that those individuals were not permitted to receive the money and other things of value.

16.    Iacobelli encouraged UAW officials General Holiefield, Norwood Jewell, Nancy A. Johnson, Virdell King, Keith Mickens and others to make personal purchases on their NTC credit cards. Iacobelli implemented a liberal spending policy on those cards, encouraging the UAW officials to use them freely for personal purchases. Iacobelli approved over $450,000 in personal credit card purchases by UAW personnel from 2012 to June 2015. From June 2015 through 2016, other employees acting in the interest of FCA continued to approve prohibited personal purchases for UAW personnel. UAW officials purchased items such as jewelry, furniture, golf clubs, electronics, designer clothing, and other personal items using their NTC credit cards.

17.    Iacobelli and Durden approved expenditures of NTC funds to pay for personal travel, entertainment, and parties for UAW officials. The NTC's Diners Club credit card accounts were used to pay for personal travel for Holiefield and his then-girlfriend, Monica Morgan, including over $30,000 in airline tickets for Morgan, who was never an employee of the UAW or the NTC.

18.    Iacobelli and Durden concealed hundreds of thousands of dollars in

additional prohibited payments to Holiefield and Morgan through front companies. Wilson's Diversified Products LLC (WDP), owned and operated by Morgan, was created in December 2010 to provide shirts, key chains, mugs, and the like with the UAW logo on it to the NTC as its vendor. WDP was selected at the direction of Holiefield, without WDP's providing a bid, estimate, or quote. Iacobelli, Durden and another FCA employee approved the selection of WDP and subsequent payments to WDP. They considered these payments as a form of "relationship building" with the UAW and Holiefield. In 2011 and 2012, Iacobelli and other FCA employees authorized and directed the expenditure of more than $435,000 to WDP. In 2011, UAW President Bob King raised issues with Morgan being a vendor. Soon thereafter, after being approached by Morgan and Holiefield, an associate of Morgan's established Morgan Company A and was selected as an NTC vendor. A high percentage of the proceeds of Morgan Company A were transferred directly to another company controlled by Morgan, Monica Morgan Photography. In 2013, Monica Morgan Photography invoiced the NTC for funds to install a pool at the Holiefield/Morgan residence. Iacobelli, Durden and another employee, as well as UAW employees, authorized the payments, which exceeded $700,000, to these conduit vendors.

19.    Iacobelli and Durden concealed hundreds of thousands of dollars in

additional prohibited payments to Holiefield and Morgan through LTLOF. Three FCA employees served on the LTLOF Board. From 2009 to 2013, the NTC transferred over $380,000 to LTLOF. While LTLOF made selected donations of $3,000 to $4,000 to what appear to be legitimate charitable projects, the majority of funds spent by the LTLOF went to Holiefield and Morgan through Monica Morgan Photography.

20.    In June 2014, Iacobelli authorized the expenditure of approximately $262,000 to satisfy the outstanding mortgage on Holiefield and Morgan's personal residence in Harrison Township, Michigan.

21.    In August 2014, Iacobelli authorized the expenditure of approximately $25,000 for a party for UAW Vice President Norwood Jewell and the UAW's International Executive Board.

22.    In January and February 2015, Iacobelli approved the use of NTC credit cards to pay for over $30,000 in meals for UAW officials at various restaurants in Palm Springs and southern California.

9

**Attachment C**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of FCA US LLC (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Attorney's Office for the Eastern District of Michigan (the "United States") are as described below:

1.     The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph Six of the Rule 11 Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.     The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement so as to specifically address and reduce the risk of any recurrence of the Company's misconduct, including any possible violations of the Labor Management Relations Act. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below: (a) the Company's oversight of the dissolution of the UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center ("NTC"); and (b) the development and effectiveness of the Company's internal controls, compliance policies, and procedures as they relate to (i) the establishment and

1

maintenance of the Taft-Hartley trust funds that will serve as the successor to the NTC (the "LMC Trust" and the "VEBA Trust") and (ii) payments and funding from the Company to the LMC Trust and VEBA Trust, and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program with respect to the topics set forth in the Mandate in accordance with the principles set forth herein and applicable law, including applicable data protection and labor laws and regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 6-7; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants, as well as to the NTC, the LMC Trust, and the VEBA Trust.

4.    Any disclosure by the Company to the Monitor concerning violations of the Labor Management Relations Act shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the United States, pursuant to the Agreement.

5.    As part of the Company's obligations under the Agreement, the Company shall give its permission for any Monitor appointed by the Court in the case of United States v. International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, Case No. 20-cv-13293 to attend, at the Monitor's option, all board meetings of the NTC, the LMC Trust, and the VEBA Trust, except for portions of such meetings covered by the attorney-client privilege, and shall use its best efforts to secure the agreement of the NTC, the LMC Trust, and the VEBA Trust for such attendance.

*Withholding Access*

6.    The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor. In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with

applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

7.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the United States. Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access. The United States may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

<em>Monitor's Coordination with the<br>Company and Review Methodology</em>

8.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

9. The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. The Monitor's review shall be limited to the topics set forth in the Mandate.

10. In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current policies and procedures regarding the Labor Management Relations Act; (b) on-site observation of selected systems and procedures of the Company relevant to the topics set forth in the Mandate; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

11. To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 17-20 below. With respect to the initial report, after consultation with the Company and the United States, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company and the United States shall

provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the United States, the Monitor shall prepare a written work plan at least thirty calendar days prior to commencing a review, and the Company and the United States shall provide comments within twenty calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the United States in its sole discretion.

12. All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

13.     The initial review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor and the United States). The Monitor shall issue a written report within one hundred fifty (150) calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's compliance program with respect to the topics set forth in the Mandate. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit a copy to the Chief of the Public Corruption Unit, U.S. Attorney's Office for the Eastern District of Michigan, 211 West Fort Street, Detroit, Michigan 48226.   After

consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the United States.

14. Within one hundred fifty (150) calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty (60) calendar days of receiving the report, the Company notifies in writing the Monitor and the United States of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor and the United States an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

15. In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the United States. The United States may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether

the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

16.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the United States.

*Follow-Up Reviews*

17.     A follow-up review shall commence no later than one hundred eighty (180) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the United States). The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 13 with respect to the initial review. After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the United States.

18.     Within one hundred twenty (120) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after

receiving the report, the Company notifies in writing the Monitor and the United States concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the United States an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

19. In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the United States. The United States may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120)

calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the United States.

20.     The Monitor shall undertake a second follow-up review not later than one hundred fifty (150) calendar days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within one hundred twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 17-19. Following the second follow-up review, the Monitor shall certify whether the Company's compliance program with respect to the topics set forth in the Mandate, including its policies and procedures and internal controls, is reasonably designed and implemented to prevent and detect violations of the Labor Management Relations Act. The final follow-up review and report shall be completed and delivered to the United States no later than thirty (30) days before the end of the Term.

*Monitor's Discovery of Potential or Actual Misconduct*

21.     (a)     Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that any person within the Company may have engaged in conduct in violation of the Labor Management Relations Act ("Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential

Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the United States at any time, and shall report Potential Misconduct to the United States when they request the information.

(b) In some instances, the Monitor should immediately report Potential Misconduct directly to the United States, and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the United States, and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c) If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the United States. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the United States, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the United States and the Monitor deem appropriate under the circumstances.

(d) The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or

Actual Misconduct, whether previously disclosed to the United States or not. Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the United States and address the Company's failure to disclose the necessary information in his or her reports.

(e)     Neither the Company, nor anyone acting on its behalf, shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

### Meetings During Pendency of Monitorship

22.    The Monitor shall meet with the United States within thirty calendar days after providing each report to the United States to discuss the report, to be followed by a meeting among the United States, the Monitor, and the Company.

23.    At least annually, and more frequently if appropriate, representatives from the Company and the United States will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the United States, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

24.    The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the United States determines in its sole discretion that disclosure would be in furtherance of the United States' discharge of its duties and responsibilities or is otherwise required by law.